In the Matter of RALPH J. M. BULLOWA, an Attorney.

First Department, May 25, 1928.

Attorney and client — disclipinary proceedings — attorney censured for advising client to change contracts and books for purpose of defrauding United States government when it took over client's plant for war purposes.

The respondent, an attorney at law, acted as an officer of a corporation belonging to a client. The corporation had contracted to purchase certain boats from another corporation which was also owned by the client. The United States government was about to take over the client's boatbuilding corporation and the respondent wrote a letter in which he suggested cancellation of the present contracts and the execution of new contracts at a higher rate, apparently for the purpose of showing that the corporation's assets were more valuable, thereby inducing the government to pay a larger sum therefor. The respondent's conduct came to the attention of the Maritime Law Association and he appeared before that body, acknowledged his mistake and expressed his regret for his conduct, and pleaded extenuating circumstances. Later, before the official referee, he sought to withdraw his prior apology and statement of regret.

The finding of the official referee that the respondent did not advise his client in the matter is not sustained, for it is evident that a suggestion of a possible course of action involving fraud is the equivalent of advice to take that action.

The interests of justice do not require any punishment of the respondent in this proceeding other than the expressed censure contained in the opinion.

DISCIPLINARY proceedings brought against respondent by the Association of the Bar of the City of New York.

*James Byrne* of counsel [*Einar Chrystie* with him on the brief], for the petitioner.

*John J. Curtin* of counsel [*Earl B. Barnes*], for the respondent.

DOWLING, P. J. The respondent was admitted to practice as an attorney and counselor at law at a term of the Supreme Court, Appellate Division, First Department, in February, 1903.

The charge herein is that in July, 1917, the respondent, while acting as attorney for the Pennsylvania Shipbuilding Company and with knowledge that the United States government was about to requisition all shipping and property pertaining to shipping and shipbuilding, counseled and advised the officers of the shipbuilding company to alter, create and falsify documentary evidence as to the value of property belonging to the company about to be requisitioned by the government, with the intention of thereby influencing the representatives of the government, authorized to fix the value of such property, in the performance of their duties.

The charge is predicated upon the contents of a letter prepared

38

by the respondent and sent by him to H. E. Norbom, the president of the shipbuilding company, of which the following is a copy:

" FERDINAND E. M. BULLOWA,

" EMILIE M. BULLOWA,

" RALPH JAMES M. BULLOWA,

    " Counselors at law.

          " Telephone, Broad 5488

          " Cable Address, Rulbul

      " 32 Broadway,

          " NEW YORK, *July* 25, 1917.

" H. E. NORBOM, Esq.,

   " Land Title Building,

      " Philadelphia, Pa.:

"DEAR MR. NORBOM.— The four last contracts were sold to the Bulk Oil and my information is that the cost was $125 per ton. I do not know what information you have given the United States Government about these contracts but of course we would not want to have them be taken over at that price. It might be advisable to have the present contracts cancelled and new contracts made as of a month ago at a price of say $190 per ton. Would this course of procedure meet your views? Suppose you telegraph me in the morning in such a way that I only would be able to understand the purport of your wire. How will this affect your books and the notes heretofore given?

      " Very truly yours,

       " RALPH JAMES M. BULLOWA."

The contracts referred to in the letter had previously been entered into between the shipbuilding company and Bulk Oil Transports, Inc., and they provided for the construction of four ships of an aggregate tonnage of 40,000 tons at a price of $125 per ton. The difference between the price fixed in the contracts and the new price suggested by the respondent in his letter to Norbom amounted to $2,600,000.

The evidence established that in the summer of 1915 the respondent became the attorney for Christopher Hannevig, a Norwegian, then engaged in the shipping business in the United States, who subsequently caused a number of corporations to be formed in this country and elsewhere to further his business enterprises. He owned all the stock in these corporations. The respondent acted as attorney for the companies organized in this country and served as an officer and director in several of them. Hannevig was frequently abroad and during his absences from this country the respondent in conjunction with Hannevig's brothers and business associates acted as attorney in fact pursuant to powers of attorney

executed by Hannevig. The respondent took an active part in the management of the business carried on by Hannevig's various companies and was consulted in regard to practically everything of any importance that was done. Among the corporations owned and controlled by Hannevig were the Pennsylvania Shipbuilding Company, incorporated in February, 1916, and Bulk Oil Transports, Inc., incorporated in June, 1916. The respondent acted as president and secretary of Bulk Oil Transports, Inc. In January, 1917, four contracts between Bulk Oil Transports, Inc., and the Pennsylvania Shipbuilding Company were reduced to writing and signed by the representatives of both companies. The respondent signed these contracts as president and secretary of Bulk Oil Transports, Inc. These contracts contained recitals that they were subscribed " as of " August 1, 1916. Each of them provided for the construction of a ship by the Pennsylvania Shipbuilding Company for Bulk Oil Transports, Inc. The aggregate tonnage of these four ships to be constructed was 40,000 tons. The price to be paid for them by Bulk Oil Transports, Inc., was at the rate of $125 per ton. The contracts provided for payments aggregating $500,000 on account of the purchase price at the time of the execution thereof. When the contracts were reduced to writing and executed in January, 1917, Bulk Oil Transports, Inc., instead of paying to the Pennsylvania Shipbuilding Company $500,000 in cash, as the aggregate initial payment, gave the shipbuilding company $5,000 in cash and notes for the balance of $495,000.

In February, 1917, Germany announced her intention of conducting an intensive submarine warfare on all shipping to the allies. It was then a matter of common belief that it was only a question of time before our country would be compelled to enter the war and our government officials began to plan and prepare for the requisitioning of all industries and properties which would be useful in the expected struggle. The United States Shipping Board and the United States Emergency Fleet Corporation were created and Congress authorized the President to requisition all ships, shipyards, boats in course of construction and anything pertaining to the shipbuilding industry which might be deemed useful to the government.

On July 25, 1917, when the respondent wrote the letter which forms the basis for the charge made against him in this proceeding, he knew that the government was about to requisition the property belonging to the Pennsylvania Shipbuilding Company and the Bulk Oil Transports, Inc. At this time very little construction work had been done on the ships which were to be built in accordance with the terms of the contracts referred to in the respondent's letter.

First Department, May, 1928.　　　　　[Vol. 223

Norbom referred the letter of July 25, 1917, to George S. Hoell, the secretary of the Pennsylvania Shipbuilding Company, for reply and instead of replying by telegraph, as requested by the respondent, Hoell prepared and sent him a letter of which the following is a copy:

"*July* 27, 1917.

" Ralph James M. Bullowa, Esq.,

" 32 Broadway, New York:

" Dear Sir.— Your letter of July 25th, addressed to Mr. Norbom, has been referred to the writer.

" We have been aware of the fact that in reporting the Bulk Oil Steamers to the Navy Department, at the prices at which the contracts were closed, we may have made it difficult for you to dispose of these steamers to the Government at the prices now prevailing, should the Government decide to take them over.

" Conditions, however, have led us to the following argument:

" When the Navy Department asked us some time in April to give them an accurate list by return mail of the steamers contracted for, together with other data, including prices, we were considering for a moment leaving out the Bulk Oil Steamers (the Nos. 5, 6, 11, 12, 13 and 14) but found this inadvisable, first, because the Government might then have found occasion to request us to reserve room for their steamers after No. 10 and No. 4 were finished and, secondly, because these Bulk Oil Steamers had already been reported to General Electric Company and the various steel companies, before we could contract for machinery and material for these steamers.

" The next thought in our minds was to make out new contracts with the Bulk Oil Transports, and at such prices as Hannevig might direct, but this would involve changing the date from August 1st to some later date around March. This, however, could not be done because the Bulk Oil Steamers, as mentioned above, had already been reported as contracted for and we could not undertake to keep the contract date and raise the price from $125 to say $200 per ton, because everybody would know that such prices were not paid on August 1st on such vessels for delivery two years hence.

" In our opinion, the result of this argument is that the Government can hardly demand that the Bulk Oil Transports, Inc., hand over to them their ships at such price as the latter agreed a year ago to pay, because the intrinsic value of the ship is probably worth $100 per ton more to Bulk Oil Transports, Inc., today than a year ago, and this argument is borne out by the fact that both No. 5 and No. 6 were sold to Cunard Steamship Co. after our report had been turned in, at prices amounting to $200 per ton. It may be mentioned, however, that this information has been

given to the Navy Department principally for the purpose of determining whether our yard would be open for construction of naval vessels.

" We assume that if the Government takes over any merchant vessels it will be done through the Shipping Board and reports given to the Shipping Board do not contain information in regard to price.                              Yours very truly,

            " PENNSYLVANIA SHIPBUILDING COMPANY,
" GSH /R                        ................Secy. & Treas."

The respondent's letter of July 25, 1917, addressed to Norbom and a copy of Hoell's replying letter of July 27, 1917, were discovered in the files of the Pennsylvania Shipbuilding Company by representatives of the United States government in the course of their preparation of the government's case in the arbitration proceeding between the United States and Norway before the Permanent Court of Arbitration at The Hague. Both letters were printed in the record submitted to the court in that proceeding. Senator George Sutherland (now one of the justices of the United States Supreme Court) acted as counsel for the United States in the arbitration proceeding. In the brief submitted by him to the court he referred to the contents of these two letters and respondent's conduct in the following language:

" BULLOWA'S PROPOSAL TO CREATE SPURIOUS CONTRACTS AT HIGHER PRICES.

" The readiness of Hannevig's lieutenant in America to attempt to victimize the United States with spurious contracts is amply demonstrated by the record before this honorable Tribunal. The arch-fabricator appears to have been Ralph James Bullowa, the legal guide and counselor of Hannevig and an officer in his American corporations.

" On July 25, 1917, when requisition was certain, Bullowa took active steps to cheat his government with fictitious prices on ships to be requisitioned. The Hannevig company of which he was president, had four contracts with the Hannevig Shipbuilding concern known as the Pennsylvania Shipbuilding Co. Bullowa made a written proposal that the prices be increased so the United States government would have to pay more in taking the ships over. His letter is a gem among the many illustrations of the methods of Hannevig's lieutenants. Let it speak for itself. [Then follows the letter of July 25th, 1917.]

" Too Late to Defraud the Government.

" The reply to Bullowa's letter indicates that ' some one had blundered ' badly, for the truth about the contract prices had

already been reported to the Navy Department. The only consoling thought in this communication was that Hannevig's Pennsylvania Shipbuilding Company had not overlooked the possibilities of deceiving the government. It had thought and planned, but had decided it would be too dangerous to change contract dates and change the prices from $125 to $200 per ton as at one time contemplated. All of this is plain from the letter which purports to have been signed by the Shipbuilding Company's Secretary and Treasurer. The first few paragraphs deserve quoting here to show the perfect sympathy between Bullowa in New York and his associate at the plant: * * *."

After the arbitration had been concluded the respondent's letter of July 25, 1917, Hoell's reply thereto and Senator Sutherland's accusations against the respondent were brought to the attention of the Maritime Association of the United States. On May 4, 1923, that association adopted a resolution calling for the appointment of a committee of five members to investigate a charge against respondent of having deliberately taken steps to defraud the United States in connection with the aforesaid matter.

The chairman of the committee appointed to investigate the charge having notified respondent thereof, the respondent appeared before the committee on June 20, 1923, accompanied by his counsel, who read to it the following letter prepared and signed by respondent:

"*June* 20, 1923.

" Committee Maritime Law Association of U. S.

" Hon. Harrington Putnam,

" *Chairman.*

" Gentlemen.— Referring to resolution of May 4, 1923

" The printed matter transmitted to me with your letter of June 12, 1923, confirms my suspicion. For a long time I have been threatened with just what has been done, in efforts to intimidate and coerce me in my professional relations.

" The letter of July 25, 1917, has no relevancy to the United States-Norway Arbitration. The question before the Permanent Court of Arbitration at the Hague was what in fairness, justice and honesty the United States should pay to discharge its obligations. Evidently the court was not influenced by the letter. It would be strange if any unbiased, fair-minded tribunal could be prejudiced in such a way. Reference to the letter by counsel for the United States, in his argument before the Court of Arbitration, did not bear upon the subject-matter of the case. His opinion of that letter or of its writer was wholly immaterial. What object did counsel hope to accomplish by his comments upon the letter?

" In 1914 and 1915 I was vigorously pursuing people who were antagonistic to our government and unfriendly to our nation; they were subjects of and represented a country with which the United States became at war, within a short time afterward, or were Englishmen who betrayed their Country. I then received intimations and threats that if I did not desist I would be driven from the ranks of the Admiralty bar, by the stupendous influence of the people I opposed.

" ' I refused to bow the head or bend the knee.' Now I find my accuser is the representative of these very people and interests who then threatened me.

" I first desire to thank the committee for omitting a formal charge and giving me an opportunity to make the following explanation:

" At the time the letter of July 25, 1917, was written (nearly six years ago), I did not appreciate its significance. The letter was a communication between two officers of a private corporation and was not written in any professional capacity. I was not seeking personal gain or profit and would have made nothing if it were acted upon. I was overzealous and thoughtless. The excitement of the time affected me. The minds of all the people were inflamed. All around me were men of high station and of supposed honor and respectability engaged in enriching themselves out of our government's necessities. I had no such thought. What I did have in mind was to save a private business concern, of which I was a servant, from loss and destruction. Nevertheless, it did suffer losses and was destroyed.

" As the letter of July 25, 1917 was never acted upon, the United States was not harmed by it; the letter caused no injury to anyone but me. It has hurt my pride, lowered my self-respect and caused me great distress and mental anguish.

" Frankly, I admit the letter should not have been written; I have ever since repented it and do not now attempt to condone it. I think, however, I have made atonement. After the letter was written, I offered my services to my country and applied to Assistant Secretary of Navy Roosevelt for assignment to active service.

" I applied to the United States Shipping Board for assignment to serve my country in the great war and offered to enlist in one of the armed branches of the service. In reply thereto I was informed that the connection of the Pusey-Jones corporations with the United States Shipping Board Emergency Fleet made it important for me to remain with them and that it would be most disastrous to have me away from its plants.

First Department, May, 1928.          [Vol. 223

" In support hereof I respectfully refer to the correspondence, copies hereto annexed. No official of the United States Government, at the time or since, has ever made any criticism of me on account of the letter of July 25, 1917, although it has for many years remained in the government's possession and notwithstanding the Shipping Board had its own treasurer in Pusey & Jones, my recollection is from the Fall of 1917 on.

" I trust the foregoing will be acceptable and satisfactory to the committee, but if perchance something more is desired, I would like an opportunity to procure a statement from the attorney who at the time was in charge of the affairs of the United States Shipping Board to corroborate me and give proof in support hereof and relative to my work with said Board.

" With great respect I submit myself to your consideration in confidence that you will not allow personal animosities to work injustice.          " Respectfully,

                                   " RALPH JAMES M. BULLOWA."

The Maritime Law Association subsequently referred the matter to the Association of the Bar of the City of New York, the petitioner in this proceeding, and after investigation made in accordance with the association's rules and by-laws, this proceeding was instituted.

Upon the record thus far set forth, we should feel justified in dismissing these charges, in view of respondent's frank and manly admission that the original letter should not have been written, that he repented of it, and that he made no attempt to condone it, taken in connection with the fact that the letter never was acted upon by the client and that by it no harm ever was done to the government or to any one else. In conjunction with these considerations, due weight must be given to the respondent's long and honorable career at the bar, this being the only charge which has ever been preferred against him.

But respondent now claims that at the time he received the charges from the Maritime Law Association and when he prepared the letter of explanation and appeared before the committee appointed by the association, he was deeply absorbed in the trial of another case in which he was personally interested, and that if he had then been in a proper state of mind and health he would not have written it. We cannot treat this belated change of front seriously. Respondent was an experienced lawyer, who knew the full extent of the charges against him and their gravity, and who not only prepared and signed the letter of confession and apology, but who was present before the committee of the Maritime Law Association while his counsel, not excusing respondent's act, pleaded

that the latter appreciated the mistake he had made, had made a frank and straightforward acknowledgment of it, and had not attempted to evade anything, but, as the counsel continued: " Mr. Bullowa's Counsel: I do not mean to say that the offense is any less because others committed a greater offense. I do not take that position at all. I am merely trying to say there were some extenuating circumstances that at that time influenced men's thoughts and actions, because we were all inflamed."

In my opinion, respondent was much better advised in the position he took before the committee than in his present effort to explain away his original letter of confession and apology.

The learned official referee reports in regard to the original letter of July 25, 1917: " In my opinion, this language cannot be construed as advice or counsel given to anybody. It is merely a suggestion of a possible course of action that the company could adopt, submitted by the respondent to the President of the Company for his judgment as to its feasibility, and I find that there is no evidence before me that the respondent actually ' counseled and advised the officers of the Shipbuilding Company to alter, create and falsify documentary evidence ' as alleged in the petition herein. He denies that he had a purpose of concealment and asserts that, had the suggested plan been carried out, it would have been done in the manner adopted by him in the sale of similar contracts to the Cunard Company by the Bulk Oil Company and in which the Cunard Line took over Bulk Oil Contracts at a price higher than specified in the contracts, and substituted for them contracts made directly between the Pennsylvania Shipbuilding Company and the Cunard Company at a higher price, the latter contracts reciting the existence of the cancelled contracts.

" If, as claimed by the respondent, his suggestion to his client included showing forth in the substituted contracts the existence of the cancelled contracts, the officials of the government could not have been deceived, and his suggestion, if carried out, would have been legal and proper. Nor do I draw any inferences unfavorable to the respondent from his inquiry as to the entries in the books and his request that the President of the Shipbuilding Company should telegraph his views upon the suggestion in a way understandable by respondent only. Clearly if the plan should be carried out honestly, new adjustments would have to be made, and those adjustments would have to be shown on the books of the companies. There is nothing necessarily sinister in this inquiry nor in the request by the respondent for a perfectly private answer by telegraph. It was a legitimate request, considering the times and the importance of the subject, to prevent his business from

being disclosed to others.  *  *  *  Nevertheless, the language of his letter falls far short of counselling and advising the altering, creating and falsifying of documentary evidence by concealing the fact of the existence of the old contracts. In his letter he merely asks for the judgment of the President of the Shipbuilding Company upon the question of cancelling the old contracts and substituting new ones. There is no suggestion of concealing the existence of the old ones. It would be an unwarranted construction of his language to read into the letter that respondent advised any concealment from the government."

In so far as this opinion holds that the letter cannot be construed into giving advice or counsel to anybody, we cannot agree with it. The effort to distinguish between a " suggestion of a possible course of action " given by a lawyer to a client, and " advice or counsel " given by the former to the latter, is without force or basis. The precise form of words in which the advice is couched is immaterial. The question is, has the lawyer conveyed to the client the idea that by adopting a particular course of action he may successfully defraud some one or impede the administration of justice? If a bank official, who had proved unfaithful to his trust and robbed his bank, should call upon a lawyer, tell him what he had done and ask for his suggestion as to what he should do, could the lawyer escape responsibility by saying to his client, " Have you thought about stealing as much more from your bank and then going to the southern part of the Argentine, where you are not likely to be traced for a long time? " instead of saying directly, " I advise you to steal twice as much and run away? "  In my opinion the precise language used by a lawyer to his client is immaterial, if its effect is not only to advise or counsel, but even to suggest or indicate, a course of action which will enable the client to defraud another or to set the due processes of law at defiance, or to evade or circumvent them by trickery or fraud.

In my opinion the interests of justice do not require any punishment of respondent in this proceeding further than the expressed censure which is contained hereinbefore.

MERRELL, FINCH, MCAVOY and PROSKAUER, JJ., concur.

Respondent censured.    Settle order on notice.